37 C.C.P.A.(Patents)

## Application of BLOOMER.
### Patent Appeal No. 5622.

United States Court of Customs
and Patent Appeals.

Argued May 10, 1949.

Decided Sept. 30, 1949.

Rehearing Denied Dec. 12, 1949.

Nathaniel Ely, New York City (Richard G. Radue, Washington, D. C., of counsel), for appellant.

W. W. Cochran, Washington, D. C. (J. Schimmel, Washington, D. C., of counsel), for the Commissioner of Patents.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, and JOHNSON, Associate Judges.

GARRETT, Chief Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the rejection by the Primary Examiner of four claims numbered 16, 17, 18, and 19 in appellant's application for patent relating "to the refining of fatty acids and particularly to an improved method of obtaining fractions of fatty acids having different characteristics." No claim was deemed allowable by the tribunals of the Patent Office.

In the brief and at the hearing before us it was moved on behalf of appellant to dismiss the appeal as to claims 16 (which was quoted by the board as representative) and 17. The motion will be allowed.

This leaves to be considered only claims 18 and 19, both of which are method claims. They read:

"18. The method of resolving a mixture of the fatty acids derived from soy bean oil into the relatively unsaturated acids and the relatively saturated acids which comprises mixing a mixture of the fatty acids having an iodine number of approximately 137 (Wijs) with methyl ethyl ketone at a temperature to effect solution, the ratio of the solvent to the fatty acid feed mixture ranging from approximately 2:1 to 4:1, reducing the temperature of the mixture of fatty acids and methyl ethyl ketone to below 20° F. to solidify and precipitate out the relatively more saturated acids, and filtering said latter mixture to recover approximately 85% of the fatty acid feed mixture as unsaturated acids having an iodine number in excess of 145 from the remainder of the fatty acid feed mixture as saturated acids having an iodine number less than 13.

"19. The method of resolving a mixture of the fatty acids derived from soy bean oil into the relatively unsaturated acids and the relatively saturated acids which comprises mixing a mixture of the fatty acids having an iodine number of approximately 137 (Wijs) with methyl ethyl ketone at a temperature to effect solution, the ratio of

the solvent to the fatty acid feed mixture ranging from approximately 2:1 to 4:1, reducing the temperature of the mixture of fatty acids and methyl ethyl ketone to below 20° F. to solidify and precipitate out the relatively more saturated acids, and filtering said latter mixture to recover approximately 85% of the fatty acid feed mixture as unsaturated acids having an iodine number in excess of 145 from the remainder of the fatty acid feed mixture as saturated acids having an iodine number less than 13, and washing the remainder of the fatty acid feed mixture as filter cake with wash solvent, the ratio of the wash solvent to the fatty acid feed mixture ranging from approximately 1:1 to 2:1."

It will be noted that specifically the claims are limited to soy bean oil as the material whose acids are to be separated, and limited to methyl ethyl ketone as the solvent used in the separation.

In his official statement following the appeal to the board the Primary Examiner cited four references. Two of those were, in effect, rejected by the board as "unsatisfactory evidence of the use of methyl ethyl ketone in a related process."

The two references relied on by the board in affirming the Primary Examiner's rejection are the following patents: Grote et al., 2,113,960, Apr. 12, 1938; Brown, 2,340,104, Jan. 25, 1944.

We quote from the brief of the Solicitor for the Patent Office the following description of the reference patents, omitting page references as indicated by asterisks:

"The patent to Grote et al. * * * relates to a method of separating into their saturated and unsaturated constituents mixtures of organic substances of high molecular weight such as fats, waxes, and fatty acids containing not less than seven carbon atoms per molecule * * *. To the accomplishment of that result the patentees treat the mixtures with a solvent at a temperature at which its substances are completely dissolved in the solvent, cool the solution until the saturated constituents are crystallized out, and then filter out the

insoluble matter * * *. The insoluble material remaining on the filter is washed with solvent to remove entrained matter, and the unsaturated constituents are obtained by evaporation of the solvent * * *. Examples of suitable solvents are given, among these being acetone * * *, and for other solvents reference is made to 'Industrial and Engineering Chemistry,' 1931, Vol. 23, No. 7, page 753 * * *.

"The patent to Brown * * * describes a process for separating from a mixture of fish-oil fatty acids a fraction composed largely of the highly unsaturated fatty acids of the original mixture relatively free from saturated fatty acids * * *. This result is accomplished by dissolving the fatty acids in an organic solvent, the concentration of acids in the solution being relatively low, and then cooling the solution gradually to a temperature, from 0° C. downwards, low enough to throw out of solution the greater part of the saturated acids * * *. The crystals of saturated acids are separated from the solution by filtration and washed with fresh solvent * * *. Among the solvents said to be suitable is acetone * * *."

It is recited in appellant's application (which appears to have been filed July 12, 1941), in substance, that separation of the saturated and unsaturated acids theretofore had been accomplished principally by distillation, which is said to have disadvantages, and that "liquid-liquid extraction" and "liquid-solid separation" (solvents being used) had been proposed but that attempts in that respect had not been entirely satisfactory. The specification then states: "It is an object of my invention to effect a separation of a mixture of fatty acids into relatively more saturated and relatively more unsaturated constituents by means of superior types of selective solvents."

While the *specification* states that it is appellant's object "to separate soy bean acid and *other vegetable and animal fatty acid mixtures* (italics ours) into fractions comprising the relatively more saturated and the relatively more unsaturated constituents so that the respective acids may

be more advantageously utilized," the *claims* are limited to the fatty acids derived from soy bean oil, and it may be said that neither of the references names soy bean oil or soy beans.

The claim is that by mixing methyl ethyl ketone with a mixture of the acids of soy bean oil of the iodine number described in the proportions stated, at a temperature to effect solution, and then reducing the temperature as defined, etc., a fraction of approximately 85% of unsaturated acid may be obtained.

We understand from the record that the unsaturated acid is in demand for the manufacture of paints, lacquers, varnishes, and other industrial products, and that the saturated acids are used in the making of glycerides which have food value.

In the brief on behalf of appellant it is contended, in substance, that the claims are not anticipated; that appellant relies upon certain details as constituting "Critical Conditions"; and that the issue is "Criticality."

The limitations claimed to be critical are:

First, The material—that is, the fatty acids of soy bean oil.

Second, The production of an effective solution of the material so that the saturated fractions can be removed from the unsaturated fractions—meaning, apparently, "the ratio of the solvent [the methyl ethyl ketone] to the fatty acid feed mixture ranging from approximately 2:1 to 4:1."

Third, The temperature of crystallization—recited in the claims as below 20° F.

Fourth, The wash ratio. This applies to claim 19 only, where it is said that the ratio of wash solvent to the fatty acid feed mixture ranges from approximately 1:1 to 2:1.

Fifth, The solvent itself.

We think it is obvious that, upon the record presented, primary consideration must be given to the first and fifth features, that is, to the material which is to be fractionated and the solvent which is mixed with that material.

The patent to Grote et al. states: "The original products which may be treated in accordance with our invention may be natural substances as well as substances obtained synthetically. Such substances are waxes and fats, that is, fatty acid esters * * *. With respect to mixtures of fatty acids, such acids as are obtained by various saponification processes from animal or vegetable tallows, bone fat, palm oil, hardened fish oil, or other oil, may be successfully treated. * * * Instead of the fatty acids, the fats themselves, i. e., fatty acid esters, may be separated. An example is the so-called fine tallow which by our method may be separated into oleo margarine and oleo stearine. Another example is the so-called cotton oil."

It should be understood that Grote et al., like appellant, teach the use of a "selective" solvent. The specification of their patent (application for which was filed in the United States—an application was filed earlier in Germany—July 10, 1934) states that in the naphtha or petroleum industry "selective" solvents "are used to an increasing extent for separating naphtha fractions into saturated and unsaturated constituents," but states, in substance, that (previous) attempts to apply such solvents to mixtures containing alcohols and fatty acids had not been successful.

We here quote from the Grote et al. specification the phraseology relating to the selective solvents, use of which it teaches:

"A suitable selective solvent for practicing our invention should completely and easily dissolve the substances in the mixture at temperatures of 25° C. to 50° C., and at lower temperatures, ranging from 15° below zero to 15° above zero centigrade, it should dissolve unsaturated constituents appreciably more easily than saturated constituents. Examples of such solvents are those which are known in the petroleum industry as suitable for splitting naphtha fractions into constituents rich in hydrogen and known as paraffinic ones, and into constituents poor in hydrogen and known as aromatic and unsaturated ones, for instance, liquid sulphur dioxide, phenol, nitrobenzene, B and B' dichlorethyl ether,

furfurol, acetone, or mixtures of liquid sulphur dioxide and benzene; phenol and water or glycerine; furfurol and benzene, etc. For other solvents see "Industrial and Engineering Chemistry", 1931, Vol. 23, No. 7, page 753. "We have found that carbon disulphide is particularly advantageous as solvent for carrying out the process described."

It is noted that in the claims of the patent carbon disulphide is the only solvent named.

■ In the discussion of the fifth feature—the solvent element—the brief of the Solicitor for the Patent Office seems to take the position that the Industrial and Engineering Chemistry publication referred to by Grote et al. may be looked to by us for some purposes—at least, the brief asserts that "insofar as appellant is concerned" he can derive no benefit from what the board said concerning it. We are unable to agree with this position of the solicitor, if it is meant that we may look to the publication as a reference on the question of anticipation, or analogy. The publication in question under the heading of "Ketones" names methyl ethyl ketone as a solvent "used for selective extraction of petroleum oils," and the solicitor's brief asserts that "since both acetone and methyl ethyl ketone are specifically named the use of methyl ethyl ketone as the solvent in Grote et al. is taught just as though it had been specifically named in the printed patent."

That part of the board's decision which we regard as overruling the publication as a reference reads in full: "For reasons which will appear below, we are of the opinion that the use of methyl ethyl ketone as the solvent in Grote et al's process lacks invention. We reach this opinion independently of the Freeman and 'Industrial and Engineering Chemistry' references which we consider unsatisfactory evidence of the use of methyl ethyl ketone in a related process."

There follow the reasons of the board which seemingly are predicated upon the fact that methyl ethyl ketone is a homologue of acetone, which latter the Grote et al. patent does name independently of the publication.

The board gave no reason for its view that its use as listed in the publication was not satisfactory evidence of its use "in a related process." We are unable to conceive of any reason other than the surmise that the board did not regard a process for the extraction of petroleum oils as being related to a process of fractionating, or separating, the fatty acids of soy bean oils.

Whatever its reason, the fact remains that the board, in our opinion, overruled the publication as a prior art reference and the statement in the patent concerning it, we think, cannot properly be held to make it one. As for appellant deriving any benefit from the statement of the board, it may be said that the publication need not be considered because it was not a ground of rejection, being expressly eliminated by the board's decision. If it was not a good reference standing alone, it was not rendered good by being included in the Grote et al. specification. We have here the reverse of the situation which existed in cases such as that of In re Boyce, 144 F.2d 896, 32 C.C.P.A., Patents, 718, where the board did not expressly overrule references cited by the Primary Examiner. Here the reference was expressly rejected and it is out of the case so far as this court is concerned.

In both the specification and the claims of the Brown patent the material to be operated upon is limited to fish oil. It is noted that "hardened fish oil" is one of the materials named in the Grote et al. patent. The specification of the Brown patent recites that solvents which the patentee had found to be suitable for his process "include acetone, commercial hexane, petroleum ether, methanol, ethanol, amylene, and ethylene dichloride," and most of these are mentioned by name in the numerous examples recited. Of the six claims, Nos. 1 and 6 recite only "suitable solvents" without designating any solvent eo nomine; claim 3 states, "a volatile hydrocarbon solvent" (of which we suppose there may be many); but claim 4 declares "the solvent is acetone," thus designating

one solvent eo nomine. Solvent is not mentioned in claims 2 and 5.

As has been stated, the Brown application was filed October 4, 1940. This was almost six months after the issuance of the Grote et al. patent on April 12, 1938, upon an application filed July 10, 1934. Evidently, the Grote et al. patent was not regarded as prior art against the Brown application, although in the former "hardened fish oil" is one of the materials operated on, and "acetone" is one of the solvents designated eo nomine in both specifications.

We observe further that the Brown application was co-pending with the application here involved from the filing date of the latter, July 14, 1941, to the date of issuance of the Brown patent, January 25, 1944, and, so far as the record discloses, no interference was declared involving them, although a claim of the patent named acetone—of which methyl ethyl ketone is a homologue—as a solvent, and notwithstanding that it is contended by the tribunals of the Patent Office that the second, third, and fourth limitations, supra, urged by appellant as being critical, are not patentable over the Brown disclosure. The record discloses that the Brown patent was first cited as a reference by the Primary Examiner in his letter of January 27, 1945.

The facts recited, in view of the dates, would seem to justify the surmise that the experts of the Patent Office found differences of a patentable nature in related processes between Brown and the application, but that, of course, is not controlling here.

We may say, however, that we can discern no reason why it is not entirely proper to consider the material which is being acted upon and the solvent itself as limitations, and we do not think it inconsistent with the decision of the Supreme Court in the case of Sinclair & Carroll Co., Inc., v. Interchemical Corporation, 325 U. S. 327, 65 S.Ct. 1143, 89 L.Ed 1644, to do so. We think it is a fair inference that the materials and solvents in the prior art cited here were considered as limitations by the Patent Office experts when the patents were granted. Indeed, we fail to see how an intelligent conclusion can be reached in a case by treating steps or features, such as proportions, or ratios, and temperature, in an abstract manner, disregarding materials and their nature.

Therefore, we have considered here the material containing the acids and the material constituting the solvent as limitations.

When so considered, however, we are of opinion that properly they may not be held to be critical in view of the teachings of appellant's specification.

First, as to the material which is to be fractionated—soy bean oil—the specification recites: "In the following description reference is made to the solvent fractionation of soy bean fatty acids, *but it will be appreciated that fatty acids derived from other vegetable or animal sources or the like may also be so treated.*" (Italics ours.)

The italicized clause clearly broadens the field so that it falls within the scope of the Grote et al. patent, and it teaches that other sources of fatty acids are equivalents of soy bean oil for treatment by the defined process.

Second, as to the solvent—methyl ethyl ketone—the specification states: "In the solvent fractionation of soy bean fatty acids, I have found that the aliphatic ketones liquid at normal temperatures are *particularly suitable as solvents.* Specific examples of such aliphatic ketones include *acetone, methyl ethyl ketone, and methyl isobutyl ketone.*" (Italics ours.)

So, appellant clearly teaches that a solvent—acetone—used in the prior art, as taught by Grote et al. and Brown, is the equivalent of methyl ethyl ketone, and that it may be used upon material which is the equivalent of soy bean oil.

Had appellant's specification, like the claims, been strictly limited to soy bean oil as the source material of the acids and to methyl ethyl ketone as the solvent, a different situation would confront us, although we do not wish to be understood as expressing any view as to patentability under such a condition. The other limitations might have some pertinency under

such a situation, but, in view of the teachings of the prior art relative to the approximate proportions and ratios of materials to solvents, the defined temperatures of crystallization, and the feature of washing certain of the fatty acids, such limitations are not deemed to possess in themselves the criticality which renders the claims patentable. Decisions deemed in point were rendered by this court in the cases of In re Ayres, 83 F.2d 297, 23 C.C.P.A., Patents, 1118; In re Pinkerton, 156 F.2d 176, 33 C.C.P.A., Patents, 1247; and In re Switzer et al., 166 F.2d 827, 35 C.C.P.A. Patents, 1013.

The authorities cited in the brief for appellant have been examined in connection with the careful consideration given the argument in his behalf. They are not deemed to be in point under the state of facts existing in this case.

In conformity with appellant's motion, the appeal is dismissed as to claims 16 and 17. As to claims 18 and 19 the decision of the board is affirmed.

Affirmed.

By reason of illness, HATFIELD, Judge, was not present at the argument of this case and did not participate in the decision.