**CARTER PRODUCTS, INC., Joseph G. Spitzer, and Marvin Small, Appellants,**

v.

**COLGATE-PALMOLIVE COMPANY, Appellee.**

No. 7847.

United States Court of Appeals Fourth Circuit.

Argued April 20, 1959.

Decided June 25, 1959.

See, also, 151 F.Supp. 427; 243 F.2d 163.

George B. Finnegan, Jr., New York City (Piper & Marbury, John W. Avirett, II, Baltimore, Md., William L. Hanaway, Stoddard B. Colby, Jerome G. Lee, Morris Kirschstein and William D. Denson, New York City, on the brief), for appellants.

Mathias F. Correa, New York City (H. Vernon Eney, Baltimore, Md., Richard Russell Wolfe, Chicago, Ill., Thomas C. Mason, New York City, C. Frederick Leydig, Jr., Chicago, Ill., and David R. Hyde, New York City, on the brief), for appellee.

Before SOBELOFF, Chief Judge, and SOPER and HAYNSWORTH, Circuit Judges.

SOBELOFF, Chief Judge.

In an earlier litigation the validity of the patent with which we are here concerned was upheld by this Court. The primary question to be answered on this appeal is whether the plaintiffs, owners and licensee of the patent, are precluded because of the file wrapper history from having the defendant enjoined from making, using or selling a product which has been found equivalent to that disclosed in the patent. The District Judge resolved the question in favor of the defendant. Carter Products v. Colgate-Palmolive Company, D.C.D.Md.1958, 164 F.Supp. 503.

On October 13, 1953, U. S. Patent No. 2,655,480 was issued to Joseph G. Spitzer and others relating to a lather producing composition for shaving. The plaintiffs below and appellants here are Spitzer and Marvin Small, present owners of the patent, and Carter Products, Inc., their exclusive licensee, which manufactures and sells a pressurized shaving cream known as "Rise." In the original infringement suit, 4 Cir., 230 F.2d 855, certiorari denied 352 U.S. 843, 77 S.Ct. 43, 1 L.Ed.2d 59, brought by the same plaintiffs (hereinafter referred to as "Carter") against Colgate-Palmolive Company and others (hereinafter referred to as "Colgate"), an injunction had issued restraining Colgate from making or selling pressurized lather compositions covered by the claims of the Spitzer patent.

The Spitzer invention may be simply described as follows. A composition comprising an aqueous soap solution and a propellant gas compound are enclosed in a pressure tight container having a valve controlled opening. The propellant gas, being under pressure in the container, is in liquid phase. When the soap-propellant composition is released through the valve and exposed to atmospheric pressure, the propellant gas expands and produces tiny bubbles which transform the soap solution into a stable lather useful for shaving for a period of from five to ten minutes. The two claims in the Spitzer patent with which we are chiefly con-

cerned, claims 16 and 19, delineate the contents of both the soap solution and the propellant gases. The soap solution is aqueous, i. e., it has a water base, is non-gelling at room temperature and contains about 5% to 18% by weight of soap. The propellant in claim 16 comprises "at least one compound selected from the group consisting of the substantially water insoluble fluorinated-chlorinated ethanes and methanes in which all of the hydrogen atoms are replaced by chlorine and fluorine and in which the number of fluorine atoms in the molecule at least equals the number of chlorine atoms * * *." These substantially water insoluble fluorinated-chlorinated ethanes and methanes are synthetic compounds commonly known as Freons. Claim 19, otherwise the same as claim 16, specifies only two Freons: dichlordifluormethane (Freon 12) and 1,2 dichor 1,1,2,2 tetrafluorethane (Freon 114). The Freon propellants, when emitted from the container, give stability to the lather and make it suitable for shaving, for the propellant gas must be substantially insoluble in water; otherwise, the aqueous soap solution would emerge from the container unstable, without body and watery.

The application for the patent as originally filed expressly claimed as propellants (1) saturated aliphatic hydrocarbons and (2) Freons; but after these claims had been twice rejected, the saturated aliphatic hydrocarbons were deleted from the claims six days after an interview with the Patent Examiner. No reason was stated for this deletion.

The initial infringement suit by Carter was prompted by Colgate's producing a pressurized shaving cream using the aqueous soap solution and Freon propellants. After Carter prevailed in that action, Colgate altered its product by using as propellants, instead of the Freon gases previously employed, a combination of isobutane and propane, both of which are saturated aliphatic hydrocarbons. Carter then moved in the District Court for an order holding Colgate in contempt for violation of the injunction decree. Since the patent claims, as allowed, cover only

Freon propellants, Carter did not contend that the use of saturated aliphatic hydrocarbons literally infringes the patent claims. Rather, Carter claimed that the hydrocarbons are *equivalents* of the Freons. The District Judge found that:

> "The mixture of isobutane and propane of the stable lather forming composition of the Colgate altered product is the equivalent of the Freon propellant recited in claim 19 [of the Spitzer patent] * * * and methanes * * *, i. e., Freons, recited in claim 16." 164 F. Supp. 503, at page 514.

The District Judge's opinion demonstrates the equivalency of the Freons to isobutane and propane, and his finding as to this is not contested on this appeal. The District Judge held, however, that the phrase "saturated aliphatic hydrocarbons" had been deleted from the original claims "to escape rejection upon a reference from the prior art"; that, under the doctrine of file wrapper estoppel, "a patentee may not recover by invoking the doctrine of equivalents anything he has given up to meet an examiner's objection based upon the prior art"; and that, therefore, Carter is estopped from recovering "isobutane and the other saturated aliphatic hydrocarbons which they [the patent applicants] gave up by amendment."

Carter has now appealed, contending that the saturated aliphatic hydrocarbons were deleted from the claims, not to meet the Patent Examiner's objections based upon the prior art, but because (1) this chemical group included many inoperative compounds, a ground for rejection of the claims as being too broad; and (2) Patent Office practice precluded claiming the operative hydrocarbons along with the Freons, since the former fall within a different chemical classification from the latter.

■ Therefore, we must look to the file wrapper history to determine the reason for the critical deletion of the saturated aliphatic hydrocarbon propellants. The important inquiry is whether the Examiner objected to the hydrocarbons

because of the prior art and the applicant took this step to meet the objection; and it is immaterial whether the Examiner was right or wrong in his objection. Exhibit Supply Co. v. Ace Patents Corp., 1942, 315 U.S. 126, 137, 62 S.Ct. 513, 86 L.Ed. 736.

■ As originally filed in the Patent Office, the Spitzer claims disclosed a combination of an "aqueous soap solution" and a "volatile propellant" not only to produce a shaving lather, but to accomplish this result without resorting to any manual or mechanical whipping operation. Five of the claims included as propellants at least one compound taken from the class comprising saturated aliphatic hydrocarbons and Freons.[1] The remaining claims included no saturated aliphatic hydrocarbons, but certain Freon propellants. The specifications, not the claims, declared that the Freons were "particularly desirable," and that four saturated aliphatic hydrocarbons were "suitable," but because of inflammability introduced a fire hazard. The four named were butane, cyclobutane, isobutane and propane (the latter two are the very ones now used in the Colgate altered product).

All claims were rejected as "unpatentable over Rotheim in view of Iddings and the Fulton article." The applicants' attorney made several minor amendments (not pertaining to the propellants) and submitted the claims for reconsideration. Again the claims were rejected, this time "as lacking invention over Rotheim of record taken together with Getz [and] Boe." The Examiner said:

> "The use of known propellant gases as propellants for aqueous soap solutions to form brushless shaving cream lacks invention over *the art showing the use of these same propellants to expel liquid soaps,* dry cleaning soap emulsions and a host of other materials." (Emphasis supplied.)

After this rejection and a subsequent interview with the Examiner, the phrase "saturated aliphatic hydrocarbons" was deleted from the claims by the applicants' attorney without explanation. The District Judge pointed out that the only prior art patent cited which referred *eo nomine* to "liquid soaps" was Rotheim and that the only "same propellants" found in the Spitzer claims and in Rotheim were "isobutane and other hydrocarbons." This, reasoned the District Judge, shows that the Examiner based his rejection in part on the fact that both Rotheim and Spitzer disclosed the same propellants in combination with liquid soaps, and that therefore the saturated aliphatic hydrocarbons were "given up to escape rejection on Rotheim."

Additional features of the file wrapper history strongly corroborate the District Judge's conclusion.

The Rotheim patent discloses a method for *spraying* liquid materials, such as oils, fats, *liquid soaps,* waxes, paints, etc. Named by Rotheim as propellants are dimethyl ether, methyl chloride, *isobutane and other hydrocarbons,* and vinyl chloride, in that order. His patent teaches that the propellants are to *dissolve* in the materials to be sprayed. (If the propellants did not dissolve, the resulting composition would, of course, be thick and incapable of being sprayed.)

The tenor of the patent Examiner's two rejections and the "Remarks" of the applicants' attorney in response to these rejections clearly show that the Examiner thought that the Rotheim patent's reference to "liquid soaps" included aqueous soap solutions. In the first rejection the Examiner cited Rotheim as employing liquid soap in combination with low pressure propellants. It was argued in the subsequent Remarks that the term " 'liquid soap' is used to designate solutions of soap in alcohol." Inferentially, the attorney was suggesting that the term "liquid soap" could not aptly be

1. The claims did not employ the commercial term "Freon," but instead the chemical term "the saturated aliphatic partially fluorine substituted hydrocarbons and the saturated aliphatic partially and wholly chlorine and fluorine substituted hydrocarbons." For clarity, the term "Freon" is used in this opinion.

used to describe aqueous soap solutions as mentioned in the Spitzer claims, because hydrocarbon gases dissolve in alcohol soaps, as Rotheim teaches, but not in aqueous solutions. However, the Remarks continued with the following significant language: "even assuming, without conceding, that 'liquid soap' as the term is used in Rotheim means an aqueous soap solution * * *." After the second rejection, the Remarks hastened to distinguish Getz and Boe, prior art citations of the Examiner, from the Spitzer claims in the following manner: "* * * Getz contains no suggestion of combining any propellant with an aqueous soap solution, * * *" and * * * "There is no disclosure in Boe of any composition * * * combining an aqueous soap solution with the propellants claimed by the applicants * * *." Such a distinction could not safely be made with regard to Rotheim. In fact, the "even assuming, without conceding" argument, previously made after the first rejection, was again employed.

If the Examiner could not be convinced that the "liquid soaps" in Rotheim were alcohol (but not aqueous) soaps, then the similarity between Rotheim and the Spitzer claims becomes obvious: both show aqueous soap solutions in combination with hydrocarbon propellants. There can be no doubt that the applicants' attorney appreciated the serious threat posed by this parallelism. Rotheim was the only prior art patent cited in *both* rejections. Moreover, the Spitzer specifications stated that the proportionate amounts of soap and propellant employed in the composition were not critical; the cases are numerous which hold that merely a new use for an old combination is not patentable. See, for example, *Old Town Ribbon & Carbon Co. v. Columbia Ribbon & Carbon Mfg. Co.*, 2 Cir., 1947, 159 F.2d 379, 382, and *In re Thuau*, 1943, 135 F.2d 344, 30 CCPA 979.

Before deleting the saturated aliphatic hydrocarbons, the attorney vigorously attempted to distinguish between the Rotheim and Spitzer propellants. In the first rejection the Examiner had stated that

the Rotheim "propellants disclosed are dimethyl ether, vinyl chloride and methyl chloride." The Examiner did not mention the "isobutane and other hydrocarbons" that were also disclosed in Rotheim. The attorney capitalized on this omission by emphasizing that the Rotheim propellants were different from Spitzer's. Thus, the Remarks noted: "The propellants of Rotheim, dimethyl ether, methyl chloride and vinyl chloride, do not fall within the propellant definitions of the [Spitzer] claims." Moreover, the attorney pointed out that if an *aqueous* soap solution were combined with each of these three Rotheim propellants the result would be a loose, unstable structure, since these propellants are highly soluble in water.

This line of reasoning was, of course, futile because the distinction made did not go far enough. The Rotheim and Spitzer propellants could not be effectively distinguished as long as both included the hydrocarbon propellants. Highly significant is the fact that the attorney's Remarks after the deletion emphasized that he had eliminated the overlap between Rotheim and the Spitzer claims. Then, for the first time, the attorney stated: "If one familiar with the teachings of the cited patents, and particularly the Rotheim patent, were to substitute one of the *Freon type propellants* [of Spitzer] for the propellants Rotheim discloses" and combine it with an aqueous soap solution, the result would be a stable lather unexpected by Rotheim. (Emphasis supplied.) The attorney further stressed that "No citation discloses the claimed combination of an aqueous soap solution and a propellant of the class claimed." These two arguments could not have been convincingly made before the deletion. It seems more than coincidence that after the deletion, the claims were never challenged or rejected on the basis of the prior art.

The conclusion seems inescapable that the Examiner thought, rightly or wrongly, that Rotheim disclosed the combination of aqueous soaps and hydrocarbons, that this correspondence between the

Rotheim and Spitzer claims was a factor in his rejections, and that the saturated aliphatic hydrocarbons were deleted pointedly to meet this objection.

■■ The District Judge held that this deletion estops Carter from relying on the doctrine of equivalents in charging infringement. He correctly summarized the law as follows (164 F.Supp. 503, 518, 521):

"File wrapper estoppel bars recourse to the doctrine of equivalents in cases where the patentee attempts to secure through equivalents what has been rejected by the Patent Office. It prevents application of the doctrine of equivalents to recapture coverage which the patentee has surrendered by amendment whether or not prior art required the amendment.

\* \* \* \* \* \*

"The controlling point is that a patentee may not recover by invoking the doctrine of equivalents anything he has given up to meet an examiner's objection based upon the prior art." Exhibit Supply Co. v. Ace Patents Corp., 1942, 315 U.S. 126, 136–137, 62 S.Ct. 513, 86 L.Ed. 736; Smith v. Magic City Kennel Club, 1931, 282 U.S. 784, 789–790, 51 S.Ct. 291, 75 L.Ed. 707; I.T.S. Rubber Co. v. Essex Rubber Co., 1926, 272 U.S. 429, 443–444, 47 S.Ct. 136, 71 L.Ed. 335.

His more elaborate discussion of the law of file wrapper estoppel is approved and adopted. Permitting the doctrine of equivalents to apply here would result in Carter's recapturing circuitously what was purposely disclaimed in order to induce the allowance of the patent.

Carter contends that it is unrealistic to say that the hydrocarbons were deleted on account of Rotheim. The specifications of the Spitzer application disclosed Freons as equivalents of hydrocarbons. Carter reasons that if the hydrocarbons were not patentable over Rotheim, then the equivalent Freons likewise would be unpatentable; therefore, deletion of the

hydrocarbons was useless to avoid the prior art so long as the Freons were retained. As support for this contention, reliance is placed on dictum in Application of Borcherdt, 1952, 197 F.2d 550, 552, 39 CCPA 1045, to the effect that an applicant's own showing of equivalency may be a sufficient ground for rejection of the claims where one equivalent appears in the prior art. However, a long line of cases, well known at the time of the deletion, held that an applicant's own showing of equivalency cannot be the sole basis for rejecting his claims; but that substitution of equivalents is invention where the equivalency is not known in the prior art and is not obvious to one skilled in the art. Ex parte Shelton, 49 U.S.P.Q. 36; Ex parte Scrutchfield, 66 U.S.P.Q. 368; Ex parte Manor, 71 U.S.P.Q. 271; Ex parte Fein, 81 U.S.P.Q. 73, and Ex parte Ancrum, 91 U.S.P.Q. 301.

Therefore, the disclosure in the specifications that Freons and hydrocarbons are equivalents would not necessarily have rendered Spitzer's use of Freons unpatentable over the Rotheim propellants; the attorney could still try to convince the Examiner that Freons were an inventive substitute for the hydrocarbons. Deletion of the hydrocarbons, therefore, was not meaningless in the effort to overcome the Examiner's prior art objection. It is interesting to note in passing that the dictum in the Borcherdt case relied on here by Carter was later repudiated by its author. See Application of Ruff, 1958, 256 F.2d 590, 600, 45 CCPA 1037.

The conclusion that the deletion of the saturated aliphatic hydrocarbons was made to meet the Examiner's prior art objection is fortified by the total absence of any other convincing explanation. Carter maintains that the words were deleted because the class of hydrocarbons included many inoperative compounds. However, Carter concedes in its brief that some of the Freons which were retained in the same claims *also* had this deficiency. To quote the words of Carter's brief,

"The propellant gases identified in cancelled claim 12 were three gross

classes of chemical compounds * * * [One class was the saturated aliphatic hydrocarbons; the other two were Freons]. The scores of compounds comprehended within each of these gross classes included many which the patent itself taught to be useless."

If the reason for deleting the hydrocarbons was in fact inoperativeness, it would logically follow that the Freon propellant groups, having the same defect, would have been deleted simultaneously or revised. However, the Freons were retained when the hydrocarbons were deleted.

One other factor casts doubt on Carter's argument. If the hydrocarbons were deleted because some were inoperative, why were not the operative ones retained? The Patent Office permits the claiming of only one species when a generic claim is not used.[2] No generic claim was made in the Spitzer application because no true genus included only the operative hydrocarbon propellants. However, the Patent Office has permitted resort to Markush classifications, which are artificial groupings formulated by the patent applicant to include only operative compounds. Ex parte Markush, 1925 C.D. 126, 128. The accepted expression for such a grouping is "material selected from the group consisting of * * *." Allowance by the Examiner of a Markush group (i. e., an artificial class) therefore permits the inclusion of more than one species.

But, Carter contends, Markush grouping is permitted only where the species for which coverage is desired are taken from *one true* genus, and that since hydrocarbons and Freons are species of different genuses, they could not be claimed together in a Markush group. Ex parte Burke, 21 U.S.P.Q. 399. Without debating this proposition, Carter's argument appears to be nothing more than an afterthought. In the trial court Carter conceded "the possibility of claiming the saturated aliphatic hydrocarbons along with the Freons in a composite Markush group," and admitted that some people had "gotten away with" circumventing the allegedly narrow Markush rule of the Patent Office. We are not persuaded that the applicants' attorney was so willing to rely on the doctrine of equivalents for proper protection of the operable hydrocarbons that he would not at least have *attempted* to obtain claim coverage.

We conclude that since Carter is not in these circumstances entitled to avail itself of the doctrine of equivalents, Colgate has not infringed the Spitzer patent by employing isobutane and propane hydrocarbons in its altered product. The judgment of the District Court is

Affirmed.

2. 37 C.F.R., Secs. 1.141 and 1.146, 35 U.S. C.A.Appendix. These two rules were formerly combined in Rule 41 of the Rules of Practice of the Patent Office.