**CARTER PRODUCTS, Inc., Joseph G. Spitzer, and Marvin Small, Plaintiffs,**

v.

**COLGATE–PALMOLIVE COMPANY, Stalfort Pressure-Pak Corporation, John C. Stalfort & Sons, Inc., and Read Drug & Chemical Company, Inc., Defendants.**

Civ. A. No. 6924.

United States District Court
D. Maryland.

July 7, 1958.

Piper & Marbury, John W. Avirett, 2d, Baltimore, Md., Morgan, Finnegan, Durham & Pine, George B. Finnegan, Jr., New York City, William D. Denson, Washington, D. C., Jerome G. Lee, John R. Murtha, and Morris Kirschstein, New York City, for plaintiffs.

Venable, Baetjer & Howard, H. Vernon Eney, Baltimore, Md., Cahill, Gordon, Reindel & Ohl, Mathias F. Correa, Thomas C. Mason, David R. Hyde and William T. Lifland, New York City, and Carlson, Pitzner, Hubbard & Wolfe, Richard R. Wolfe and C. Frederick Leydig, Jr., Chicago, Ill., for defendants.

THOMSEN, Chief Judge.

Plaintiffs have now moved for an order holding defendant Colgate-Palmolive Company in contempt of the injunction issued against Colgate pursuant to Judge Coleman's decision herein, D.C., 130 F. Supp. 557, as affirmed by the Court of Appeals, 4 Cir., 230 F.2d 855, certiorari denied 352 U.S. 843, 77 S.Ct. 43, 1 L.Ed. 2d 59. See also 4 Cir., 243 F.2d 163 and D.C., 151 F.Supp. 427. Plaintiffs Spitzer and Small are the owners of U. S. Patent No. 2,655,480, issued to Spitzer, et al., for a lather producing composition. Plaintiff Carter Products, Inc. is the holder of an exclusive license under that patent and manufactures and sells a pressurized shaving cream known as "Rise". The injunction with which we are dealing enjoined Colgate (a) from making, using, or selling, or from actively causing or inducing others to make, use or sell pressurized lather compositions covered by the claims of the Spitzer patent for the remainder of its term; and (b) from making or offering for sale a pressurized lather shaving cream utilizing one of plaintiffs' trade secrets held to have been wrongfully appropriated by Colgate.

Plaintiffs claim that Colgate has violated the injunction (I) by continuing to induce the sale by retailers of the adjudi-

cated products after it was served with the writ of injunction, and (II) more importantly, by manufacturing a new, altered product and advertising and selling it under the same names as the old, adjudicated products, Palmolive Rapid Shave and Colgate's Instant Barber Shave.

Colgate uses as a propellant in the altered product a combination of two hydrocarbons, propane and isobutane, instead of the Freons listed in the claims of the Spitzer patent and used by Colgate in the adjudicated products. The altered product is sometimes referred to in the record as the "H" product. Plaintiffs do not contend that the altered product infringes the literal language of the claims of the Spitzer patent; plaintiffs contend (II–A) that the hydrocarbons Colgate now uses are equivalent to the Freons claimed in the Spitzer patent, particularly in claims 16 and 19. Plaintiffs also contend (II–B) that Colgate is still using one of the trade secrets which it wrongfully appropriated.

Colgate (I) denies that it violated the injunction in connection with the adjudicated products. (II–A–1) It denies the equivalence of the propellants, and contends (II–A–2) that plaintiffs are estopped to claim such equivalence by reason (a) of file wrapper estoppel, and (b) of judicial estoppel, by positions taken by plaintiffs at the previous trial in this court and on appeal. (II–B) Colgate denies that it is using the prohibited trade secret in manufacturing the altered product, and (III) claims

misuse of the Spitzer patent by plaintiffs.

### The Prior Proceedings

The original complaint in this action charged patent infringement by all of the defendants and wrongful appropriation by Colgate of plaintiffs' trade secrets. Plaintiffs claimed infringement of eight of the twenty claims of the patent. Defendants admitted infringement if those claims were valid, but denied their validity and prayed for a judgment declaring all claims of the patent invalid. After a long trial Judge Coleman held the patent valid and decreed that an injunction should issue enjoining infringement thereof. He also found that Colgate had unlawfully misappropriated three of plaintiffs' trade secrets.[1] Only one secret, dealing with superfatting, is involved in the present contempt proceeding. Judge Coleman decreed that the use of that secret should be enjoined, ordered Colgate to assign to plaintiffs its rights under certain patent applications, and referred the case to a special master to determine and report on the damages resulting from infringement and the damages and profits for which Colgate should be required to account because of its misappropriation of plaintiffs' trade secrets. The question whether increased damages should be awarded was reserved for future determination. An index to Judge Coleman's opinion, 130 F.Supp. 557, is set out below in note[2]. The Court of Appeals affirmed the decree, 230 F.2d 855; an index to that opinion is set out below in note[3].

1. The Court of Appeals did not sustain the finding with respect to one of the trade secrets relating to the annealing of polyethylene tubes; this, however, is unimportant, since no injunctive relief had been granted with respect thereto. See 230 F.2d at page 865.

2. Index to Judge Coleman's opinion, 130 F.Supp. 557; 560a, nature of patent; 560b, state of shaving preparation art; 561a, state of shampooing art; 561a, object of invention and composition employed to obtain objects—quoted from patent; 561b, soaps, 562a, propellants; 563b, foreign patents; 567a, U. S. patents—Rotheim, Getz, 567b, Boe; 568b,

prior use; 569b, law re validity; 570b, Spitzer's new combination; 571a, conclusion re validity; 571b, wrongful appropriation of confidential information and trade secrets; 574b, law re trade secrets; 579a, conclusion re trade secrets; 579b, laches; 580a, summary of conclusions.

3. Index to Court of Appeals opinion, 230 F.2d 855; 857b, validity—history; 858a, the invention; 860b, discussion of prior art; 861b, law re validity; 863a, trade secrets—facts; 864b, law re trade secrets; 865b, the decree; 866a, attorneys' fees.

The Supreme Court denied certiorari, 352 U.S. 843, 77 S.Ct. 43, 1 L.Ed.2d 59.

This court then issued the injunction called for by Judge Coleman's decree, as so affirmed, enjoining Colgate (a) from making, using, or selling, or from actively causing or inducing others to make, use or sell pressurized lather compositions covered by the claims of the Spitzer patent for the remainder of its term, and (b) from making or offering for sale a pressurized lather shaving cream utilizing the trade secret which was described as follows: "By combining in a pressurized lather-generating composition a soap solution superfatted with petrolatum, carbowax and excess stearic acid * * *." [230 F.2d 863.]

Thereafter Colgate filed a motion in the Court of Appeals seeking to be relieved of its stipulation admitting infringement. Colgate contended that the decision of the Court of Appeals had limited the effect of the claims as to which infringement had been admitted and had limited the invention to which the claims relate. Colgate's motion was denied, the court stating that there was no basis for the contention that it had intended to limit or did limit the scope of the invention or the claims of the patent in any way. 243 F.2d at page 164.

Colgate then sought, unsuccessfully, to have this court "clarify and amplify the decree" by changing the accounting period for damages and profits. See 151 F.Supp. 427, 428.

Meanwhile, on April 3, 1957, plaintiff had filed the motion now under consideration, for an order holding Colgate in contempt of the injunction. The issues raised are set out in the second and third paragraphs of this opinion. The facts with respect to each issue will be found and stated separately.

### Definitions

Certain terms were used by some of the witnesses in different senses. I am therefore stating the definitions of those terms as they will be used in this opinion.

In *true solutions*, the molecules of the dissolved substance, called the solute, are dispersed among those of the solvent. The single independent molecules are the unit.

In *colloidal solutions*, ultramicroscopic particles of one substance are in permanent suspension in another.

In *emulsions* microscopically visible droplets of one liquid are suspended in another.

*Soap micelles* are aggregates of soap molecules in colloidal suspension in water.

McBain[4] defines *solubilization* as a mode of bringing into solution substances that are otherwise insoluble in a given medium. So defined, it involves the complete disappearance of the original solid particle or liquid droplet, as it is taken up, molecule by molecule into the organized colloidal particles of the stable colloid itself. Some of the witnesses used the term solubilize in a different sense, to mean the taking up or envelopment of droplets, or groups of molecules, of a compound in liquid phase by the organized particles of a stable colloid, in this case the soap micelles. In such solubilization the liquid droplets of the compound propane-isobutane do not completely disappear, but remain in droplets or groups of 50 or 100 or more molecules of isobutane in association with the soap micelles. To avoid confusion, I will use the words *absorb* and *absorption* to describe the latter phenomenon.

The organic compounds referred to in the evidence include: I. Ethers; II. Aliphatic Hydrocarbons, (A) Saturated, and (B) Unsaturated; III. Halogenated Hydrocarbons, which are not true hydrocarbons, since the hydrogen atoms have been completely or partially replaced by halogens; thus we have (A) chlorinated hydrocarbons, (B) fluorinated hydrocarbons, and (C) chlorfluorinated hydrocarbons. *Freon* is DuPont's commercial name for the class of chlor-

4. J. W. McBain's introduction to M. E. L. McBain and Hutchinson's Solubilization and Related Phenomena, N.Y., 1955.

fluorinated hydrocarbons. In some of the Freons the fluorine equals or exceeds the chlorine and in some of the Freons the chlorine exceeds the fluorine.

In this case, we are principally interested in a few of the Freons and in four saturated aliphatic hydrocarbons, namely, propane, butane, isobutane and cyclobutane. Note[5] sets out a group of saturated aliphatic hydrocarbons with their respective vapor pressures, and the important Freons with their vapor pressures. Various propellants may be combined to secure a desired vapor pressure, which in a pressurized lather shaving cream must be sufficiently high to eject the mixture from the can and form a lather rapidly, but which, under ICC regulations, may not exceed 40 p. s. i. g.

## I. Inducing Sales of Adjudicated Products

Judge Coleman's decision was suspended by supersedeas pending appeal and application for certiorari. In May, 1956, while the supersedeas was in effect, Colgate discontinued the manufacture of the adjudicated products, and began the manufacture of the altered product. Colgate used the same packages, labels and advertising in connection with the altered product that it had used in connection with the adjudicated products.

On November 19, 1956, an injunction issued out of this court enjoining Colgate, inter alia, from making, using or selling or from actively causing or inducing others to make, use or sell pressurized shaving lather compositions covered by the claims of the Spitzer patent. A certified copy of the injunction was served on Colgate and its officers on or about November 20, 1956. Colgate promptly ordered its warehouses to cease shipping the adjudicated products still on hand and to hold for destruction Colgate's inventory of such products. At that time, however, Colgate's customers —wholesalers and retailers—were holding for sale approximately 1,600,000 cans of the adjudicated products: Some of these cans were the subject of existing agreements under which Colgate had promised to idemnify certain large re-

5. The vapor pressure of the compounds is sometimes expressed as pounds per square inch absolute (p.s.i.a.) and sometimes as pounds per square inch gauge (p.s.i.g.). The latter term denotes the excess of the vapor pressure of the compound over atmospheric pressure, which is assumed to be 15 p.s.i. Therefore, the vapor pressure of a compound expressed in p.s.i.g. is 15 p.s.i. less than its vapor pressure expressed in p.s.i.a.

### Saturated Aliphatic Hydrocarbon Propellants

| | | Vapor Pressure p.s.i.a. at 70° F. | Vapor Pressure p.s.i.g. at 70° F. |
|---|---|---|---|
| Methane | $CH_4$ | (not given) | —— |
| Ethane | $C_2H_6$ | 544 | —— |
| Propane | $C_3H_8$ | 130 | 115 |
| n-Butane | $C_4H_{10}$ | 31 | 16 |
| Isobutane | $C_4H_{10}$ | 46 | 31 |
| Cyclobutane | $C_4H_8$ | 22 | 7 |
| n-Pentane | $C_5H_{12}$ | 8.6 | —— |
| Isopentane | $C_5H_{12}$ | 11.6 | —— |
| Neopentane | $C_5H_{12}$ | 21.9 | —— |
| Cyclopentane | $C_5H_{10}$ | 5.25 | —— |

### Freon Propellants

| | | | |
|---|---|---|---|
| Freon 12 | $CF_2Cl_2$ | —— | 55 |
| Freon 13 | $CF_3Cl$ | —— | 465 |
| Freon 113 | $C_2F_3Cl_3$ | —— | −9 |
| Freon 114 | $C_2F_4Cl_2$ | —— | 13 |
| Freon 115 | $C_2F_5Cl$ | —— | 105 |

All other saturated aliphatic hydrocarbons mentioned in the evidence have vapor pressure of less than 6 p.s.i.a. and therefore a negative p.s.i.g.

tailers against liability for patent infringement.

Colgate took no action to prevent sale of the adjudicated products by wholesalers and retailers. It did not advise them of the injunction; it did not even advise its own salesmen and display men of the injunction. Although at various times, for various reasons, Colgate had picked up merchandise from its customers, it made no effort to do so with respect to the adjudicated products. Instead, after November 20, 1956, Colgate continued to advertise Palmolive Rapid Shave and Colgate's Instant Barber Shave without distinction between the old, adjudicated products and the new, altered product. Its salesmen and display men aided and abetted the distributors in selling their stocks of the adjudicated products in exactly the same manner as before the injunction.

 Cassidy v. Puett Electrical Starting Corp., 4 Cir., 182 F.2d 604, holds that a manufacturer, against whom such an injunction has been issued, must take reasonable steps to prevent further infringement. Colgate has not only failed in this duty; it has violated the injunction by *actively* causing, inducing, and participating in, the sale by wholesalers and retailers of 1,600,000 cans of the adjudicated products.

The reasons for Colgate's defiance of the injunction are obvious. Recall of the 1,600,000 cans would have damaged its reputation and that of its products. If Colgate's advertising had reflected the change in its pressurized lather shaving cream, the altered product could not have been launched with the momentum of good will which Colgate had built up for its adjudicated products in violation of plaintiffs' rights. Colgate's "willful and deliberate infringement" with respect to the adjudicated products continued for many months after the injunction was issued and served.

Under the terms of Judge Coleman's decree, plaintiff is already entitled to damages on the sale of the 1,600,000 cans by Colgate to its distributors. Judge Coleman left open the question whether

such damages should be trebled. 130 F. Supp. at pages 571, 580; 230 F.2d at pages 857, 866. Under the facts now found it is clear, and I hold, that those damages should be trebled. Plaintiffs are also entitled to recover reasonable attorneys' fees for prosecuting this portion of their pending motion.

The questions whether plaintiffs are entitled to enjoin the continued sale of the altered product under the same name and advertising as the adjudicated products, and to recover damages therefor, are not before this court at this time. The order to be entered herein will be without prejudice to plaintiffs' right to prosecute such claims.

## II. Manufacturing and Selling the Altered Product.

### A. The Question of Infringement.

#### (1) Equivalents.

Shortly after the trial before Judge Coleman, Colgate decided to alter the formula of the adjudicated products. In place of the Freon propellants which are claimed in the Spitzer patent, the inventor Fine, who had previously disclosed plaintiffs' trade secrets to Colgate, suggested a propellant composed of a mixture of two aliphatic hydrocarbons, propane and isobutane, which are not included in the claims of the patent but which are described in the specification as suitable propellants for practicing the invention. Fine's suggestion was adopted, and Colgate began manufacturing the altered product in May, 1956. It is still being manufactured and sold.

This contempt proceeding is based upon plaintiffs' contention that the altered product infringes Claims 16 and 19 of the Spitzer patent. Claim 16 reads:

"A package comprising a pressure-tight container having a valve-controlled opening and containing a composition for use in producing a stable lather consisting essentially of a liquid mixture of an aqueous soap solution and a volatile propel-

lant in liquid phase, the composition being confined in the container under the vapor pressure of the propellant, said soap solution comprising a solution which is non-gelling at room temperatures and which contains from about 5% to about 18% by weight of soap, said propellant comprising at least one compound selected from the group consisting of the substantially water-insoluble fluorinated-chlorinated ethanes and methanes in which all of the hydrogen atoms are replaced by chlorine and fluorine and in which the number of fluorine atoms in the molecule at least equals the number of chlorine atoms, the proportion of propellant being from about .07 to about .025 mole per 100 grams of the composition, said propellant having a vapor pressure in the range of from about 15 to about 65 pounds per square inch gauge at 70° F."

Claim 19 is based on claim 16, and reads:

"A package according to claim 16 in which the propellant consists of a mixture of dichlordifluormethane and 1, 2 dichlor 1, 1, 2, 2, tetrafluorethane."

Since propane and isobutane are aliphatic hydrocarbons, and therefore not included among the Freons specified in claims 16 and 19, plaintiffs concede that the altered product does not infringe the literal language of those claims. Plaintiffs contend, however, that the hydrocarbon propellant of the altered product is an equivalent of the specified Freon propellant, and that all other elements of those claims are literally infringed.

The aqueous soap solution in Colgate's altered product is non-gelling at room temperatures, and contains 8.87% by weight of soap. The molar proportion of the hydrocarbon propellant is .05 mole per 100 grams of the composition. This gives the lather a sustained and uniform bubble structure and a density which falls within the preferred density range taught by the patent.

The hydrocarbon propellant has a vapor pressure of about 44 p.s.i.g., and a water solubility of 7.5 cc. of propellant per 100 grams of water, which is within the preferred range of solubility taught by the Spitzer patent. It is substantially water-insoluble.

The altered product is confined under the vapor pressure of its propellant in a container having a valve-controlled opening. When the valve is opened the composition produces a stable lather having substantially the same stability, bubble size, and practical use as plaintiffs' product Rise and as the adjudicated Colgate products.

So much is not seriously disputed. But Colgate denies the equivalence of the propellants and specifically denies that the composition of its altered product in the container is "a liquid mixture of an aqueous soap solution and a volatile propellant in *a liquid phase.*" (Italics mine.)

Colgate contends that Spitzer is not a pioneer patent entitled to a wide range of equivalents.

In Graver Tank & Mfg. Co. v. Linde Co., 339 U.S. 605, 609, 70 S.Ct. 854, 856, 94 L.Ed. 1097, the Supreme Court said: "What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not require complete identity for every purpose and in every respect. * * * Consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was."

▮ The Spitzer patent falls in the field of pressure packaging and particularly in that portion of the field dealing

with the production of lathers. It relates to a composition for use in producing a soap or detergent lather for shaving, shampooing or washing, which may be applied to the skin, hair or other material. The validity of all 21 claims of the Spitzer patent was determined as between the parties hereto in the prior proceedings herein. Therefore, the prior art may not be re-examined at this time to question the validity of the patent, but it may be re-examined to determine the range of the equivalents which should be allowed.

Pressure packaging was not new at the time the subject matter of the Spitzer patent was discovered or invented. Pressure packaging had been previously used for self-generating whipped cream and for aerosol insecticides and other products which emerge from the container in the form of a spray.

Rotheim U. S. Patent No. 1,892,750, issued in 1937, disclosed the spraying of liquid soap and other materials with various propellants, including isobutane and other hydrocarbons. But Judge Coleman found that "Rotheim teaches that the ingredients of his soap solution should dissolve in the propellants, whereas it is a basic requirement of the Spitzer patent combination that such ingredient shall *not* dissolve in the propellants. Thus reliance upon Rotheim would mislead, rather than aid in attaining what the Rotheim patent teaches." 130 F.Supp. at page 567. This finding was approved by the Court of Appeals. 230 F.2d at page 861.

Boe U. S. Patent No. 2,524,590, issued October 3, 1950, discloses the pressure packaging of a wide variety of products, including products containing soap solutions, by emulsifying under pressure the material to be sprayed with a liquefied gas. A sample of the Boe wax emulsion prepared under pressure in accordance with the instructions of the Boe specifications emerges as a lather, although it is not suitable for shaving. The Boe patent, however, does not teach or suggest the creation of a lather, but of a fine mist suitable for spraying. Boe requires that the ingredients dissolve in the propellant, the very opposite of the teaching of the Spitzer patent. Boe points out how foaming may be prevented and cautions against the production of a lather. See 130 F.Supp. at page 567; 230 F.2d at page 861.

The context of the Spitzer patent in the prior art was described by the Court of Appeals in characterizing the scope of the invention: "There was, of course, nothing novel in the use of soap to make lather, nor in the use of a can as a container, nor in the use of a gas liquefied by pressure and mixed with another liquid to spray the mixture from the can. What was novel was to get a mixture of the right gases, with the right soaps in the right proportions, confined in a container under the right pressure, so that a lather satisfactory for shaving purposes would be produced when the mixture was allowed to emerge." 230 F.2d at page 858.

The plaintiffs herein have treated their product Rise as covered by Boe, by securing, before Spitzer issued, an exclusive license under Boe for the production of pressurized shaving cream. That fact, however, does not require that Spitzer be held to a narrow range of equivalents in the pressurized shaving cream section of the pressurized packaging field. In that section of the field Spitzer is a primary patent. "Whether complainant's invention be termed a pioneer or not, it unquestionably solved a problem for the solution of which others had sought in vain and made a substantial contribution to the safety of those who travel the highways. In such case, the law is well settled that he is entitled to a liberal construction of his claims and a liberal application of the doctrine of equivalents, to the end that he may not be deprived of the fruits of what he has done." Oates v. Camp, 4 Cir., 83 F.2d 111, at page 115. See also cases cited therein; Hartford-Empire Co. v. Swindell Brothers, 4 Cir., 96 F.2d 227, at pages 230, 231; Southern Saw Service, Inc., v. Pittsburgh Erie Saw Corp., 5 Cir., 239 F.2d 339, 345; Long Mfg. Co.

v. Holliday, 4 Cir., 246 F.2d 95, 100, 101, certiorari denied 355 U.S. 926, 78 S.Ct. 384, 2 L.Ed.2d 357.

One of the features of the altered product which Colgate contends distinguishes it from the teachings of the Spitzer patent is the physical relationship of the propellant to the soap solution. The Spitzer patent teaches that the " * * * insoluble portion of the propellant is in liquid phase, existing as droplets or in the form of a liquid-liquid emulsion in the soap solution." Colgate contends that its propellant (a) does not exist in liquid phase, and (b) is dissolved rather than emulsified in the soap solution.

(a) The Freons listed in the claims of the Spitzer patent and used by Colgate in the adjudicated products are substantially water-insoluble. When those Freons, in liquid phase, are mixed under pressure with an aqueous soap solution, a very small percentage of the propellant passes into true solution; most of the propellant associates with the soap micelles to form large emulsion droplets; the rest of the propellant is absorbed by the soap micelles in submicroscopic droplets. The hydrocarbons propane and isobutane are also substantially water insoluble. When those compounds, in liquid phase, are substituted for the Freons, and are mixed under pressure with the soap solution less than 4% of the propellant passes into true solutions; over 50% of the propellant is absorbed by the soap micelles in submicroscopic droplets containing on the average about 100 molecules of the hydrocarbon propellant; the rest of the propellant associates with the soap micelles to form large emulsion droplets.

Everyone agrees that the propellant in the large emulsion droplets remains in a liquid phase. Dr. Patrick, Professor Emeritus of Chemistry at the Johns Hopkins University, whose testimony I find the most credible on all disputed points, testified that in his opinion the hydrocarbon propellant in the soap micelles is also in liquid phase. Colgate's principal expert testified that the droplets or groups of 100 or so hydrocarbon molecules absorbed in the soap micelles are so small that it is impossible to say whether they are in a liquid phase, a solid phase, a gaseous phase, or some other phase not presently known to science. I find as fact, however, that under either the testimony of Dr. Patrick or the testimony of Colgate's expert, the hydrocarbon propellant in the soap micelles is either in a liquid phase or in a phase which is essentially the same as a liquid phase; upon opening the valve of the container to the atmosphere all of the propellant in the soap micelles changes into vapor and generates tiny bubbles in the same way as the propellant in the large emulsion droplets. It is these tiny bubbles which give stability to the lather and make it suitable for shaving.

(b) Colgate's hydrocarbon propellant is substantially insoluble in the soap solution. If it were not, it would not produce a stable, fine-textured lather; the molecules of the gas would dissolve in the bubble walls, and passing from the smaller to the larger bubbles, would soon reduce the lather to a coarse-textured foam which would run and be unsuitable for shaving. If a propellant such as those used in the products involved in this suit in liquid phase were added to pure water the two would not mix. The surface energy present in the interspace between the two liquids would operate to separate the propellant from the water. Shaking the container would disperse small drops of the propellant in the water, forming an emulsion. Such an emulsion would be unstable, because the surface energy of the propellant drops would tend to decrease the surface area of the propellant by coalescing droplets into fewer and larger drops. When, however, the propellant is added to a soap solution and the container is shaken a different result occurs. Because the "head" of the soap molecule is soluble in water and the "tail" is soluble in the propellant, the propellant droplets become surrounded by a skin of soap molecules, the surface tension of the droplets is reduced, and the emulsion becomes stable.

Since the soap and water are in colloidal solution, many of the droplets of the propellant are entrapped or absorbed in the soap micelles; the micelles serve the same function as the "skin" of soap molecules around an emulsion droplet, and create a stable colloidial suspension of the droplets. There is a difference in the size of the droplets involved, the emulsion droplets being generally larger than the micelle droplets; but the practical result in each case is the same. In both the soap micelles and the emulsion droplets, a liquid droplet of propellant is more or less permanently suspended in the aqueous soap solution and will, upon release to atmospheric pressure, expand into a small soap bubble.

It is true that the Court of Appeals found that the invention consisted of "the use of particular propellant gases liquefied under pressure and combined in such way with particular aqueous soap solutions as to produce an emulsion, which, when released from the container, becomes a lather composed of tiny gas bubbles coated with soap and useful for shaving—a product which was new and useful, which the expert chemists of Colgate had tried unsuccessfully to produce, and which achieved at once unqualified commercial success." 230 F.2d at page 861. It is important to note, however, and I find as a fact, that during the prior trial the terms "colloidal solution" and "colloidal suspension" were not referred to by counsel in their arguments nor by the courts in their opinions. The distinction was drawn between a "solution", in which the ingredients "dissolve in the propellants", as taught by Rotheim and Boe, 130 F.Supp., at page 567, and an "emulsion", as taught by Spitzer. One or two of the early Reich reports referred to colloidal solution or dispersion, but Professor La Mer, the inter partes neutral expert, was the only witness who referred to colloids in his testimony. He equated "colloidal dispersion" generally with "emulsion" for the purposes of the issues *then* before the court. This is important in considering the issues of equivalents, file wrapper estoppel, and judicial estoppel *now* before the court.

The testimony of Dr. Patrick, cited above, together with other testimony and exhibits produced at the hearing on the pending motion, convince me that the hydrocarbons propane and isobutane enter into soap micelles in the same way as the Freons listed in claims 16 and 19, and form emulsion droplets in the same way as those Freons. They have their vapor pressure reduced by oil additives in substantially the same way. And although most of the Freon propellant forms emulsion droplets and less than half is absorbed in the soap micelles, whereas most of the hydrocarbon propellant used in the altered product is absorbed in the soap micelles and less than half forms emulsion droplets, the difference is unimportant in this case, and does not prevent their equivalence. The most important consideration is that both of the propellants are substantially water-insoluble. Only about 4% of either dissolves into the aqueous phase of the soap solution in true solution. The remaining 96% of both is undissolved in the soap solution. Whether most of the other 96% is in emulsion or in colloidal suspension, it is in a liquid phase, or in a phase which is essentially the same as a liquid phase. Both propellants generate the tiny bubbles necessary to produce a lather suitable for shaving. The density of the altered product falls within the preferred density range taught by the Spitzer patent. The use of the word "emulsion" in the specification of the patent does not necessarily exclude the situation which exists when most of the propellant is absorbed by the soap micelles. I find as a fact that the combination of aqueous soap solution and propellant in Colgate's altered product functions in substantially the same manner and under the same physical laws to produce the same result as that of the pressurized shaving lather composition of the formerly adjudicated Colgate products and of plaintiffs' patented product Rise. That is the real test. Graver Tank & Mfg. Co. v.

Linde Co., 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097.

The Spitzer patent discloses that propane and isobutane may be used in place of the preferred Freons. It discloses that out of hundreds of substituted and unsubstituted hydrocarbons certain Freons having low solubility in water and other specified characteristics are optimum for forming stable shaving lathers which do not cause a burning or smarting sensation on the face. It also discloses that a group of four aliphatic hydrocarbons, including propane and isobutane, are equal to the preferred Freons in lather forming and non-smarting properties. It states: "We have discovered that the straight chain saturated aliphatic hydrocarbons of suitable vapor pressure, which comprise propane, butane, isobutane and cyclobutane are suitable lather-forming propellants and do not cause an undesirable burning sensation. The inflammability of these propellants introduces a fire hazard."

The patent further emphasizes the equivalence in fact between Freon 12 and Freon 114 on the one hand and isobutane and propane on the other, by giving specific examples of the substitution of isobutane and propane for Freons 12 and 114 in stable shaving lather producing compositions in which the same soap solution was used. The specification of the Spitzer patent gives three examples of formulations, using hydrocarbon propellants. All three use triethanolomine (TEA) soap, the preferred soap of the Spitzer patent; none use alkali metal soaps, but the Spitzer patent discloses alkali metal soaps as generally suitable. Colgate's internal records show that it considered that the hydrocarbon propellants would not work satisfactorily with Colgate's TEA soap formulation. The soaps of the altered product are steareates and cocoates of potassium and sodium, i. e., alkali metal soaps. The difference in the soaps is not material on the issue of equivalents, but will be considered more fully on the trade secret issue.

At the trial before Judge Coleman, Colgate's expert Smith stated without qualification that the Spitzer patent classifies isobutane as equivalent to the Freons. The equivalence of the specified hydrocarbons with the claimed Freons was urged by Colgate's counsel and not disputed by plaintiffs' counsel or witnesses. They based their case on other grounds.

Colgate derived its hydrocarbon product directly from the teachings of the patent and the knowledge of the patentees, and not by independent research. When Colgate saw the handwriting on the wall, immediately after the hearing before Judge Coleman, it had only to follow the teachings of the patent to come up with a satisfactory product using an equivalent propellant disclosed by the teaching of the patent. This is an element to be considered. Graver Tank & Mfg. Co. v. Linde Co., 339 U.S. at pages 611–612, 70 S.Ct. at pages 857–858; Long Mfg. Co. v. Holliday, 246 F.2d at page 101.

The mixture of isobutane and propane of the stable lather forming composition of the Colgate altered product is the equivalent of the Freon propellant recited in claim 19, and of the fluorinated and chlorinated ethanes and methanes in which all of the hydrogen atoms are replaced by chlorine and fluorine and in which the number of fluorine atoms in the molecule at least equals the number of fluorine atoms, i. e. Freons, recited in claim 16.

The Colgate propellants and soap solution are in the physical-chemical relationship required for the invention of the patent in suit. The combination responds to the definition of the invention and functions in substantially the same manner to produce substantially the same results as the package and composition recited in claims 16 and 19.

II-A-2(a) File Wrapper Estoppel

The basic question on this issue is whether the original claims which included saturated aliphatic hydrocarbons

among the claimed propellants were canceled by applicants (a) because the claims were too broad to be valid, or (b) in order to meet the objections of the examiner based upon his understanding of the prior art, right or wrong, or (c) for both reasons.

The application for the Spitzer patent was filed on November 2, 1949. The invention was originally described as relating to "a composition for use in producing a soap or detergent lather without resorting to any manual or mechanical whipping or agitating operation, and further includes a method for producing such a lather employing the improved composition".

Certain of the claims of the application as originally filed (Nos. 1, 2, 4, 5, and 12) expressly claimed as propellants compounds from (1) the saturated aliphatic hydrocarbons, (2) the saturated aliphatic partially fluorine substituted hydrocarbons, and (3) the saturated aliphatic partially and wholly chlorine and fluorine substituted hydrocarbons.[6] Each of these classes includes a considerable number of compounds. The specification of the patent as originally filed on November 2, 1949, and as finally issued on October 13, 1953, disclosed that certain of the so-called chlorfluorinated hydrocarbons (Freons) were the preferred propellants. The specification also disclosed that saturated aliphatic hydrocarbons with pressures of about 5 to about 300 p. s. i. g. at 70° F. may be used as propellants with soap solutions to produce a foam or lather, but that the inflammability of these propellants introduces a fire hazard. At the time the specification was drafted the patentees had decided that propane, butane, isobutane and cyclobutane were the only saturated aliphatic hydrocarbons of suitable vapor pressure "promising enough to be worth covering", and the specifications listed those four.

All of the claims of the patent application as originally filed were rejected by Patent Office action on May 26, 1950, citing as prior art, inter alia, Rotheim U. S. Patent No. 1,892,750. The examiner stated: "Rotheim shows that combinations of liquid soaps and low pressure propellants to be old (sic)". The examiner mentioned as propellants disclosed by Rotheim dimethyl ether, vinyl chloride and methyl chloride. Rotheim also discloses isobutane and other hydrocarbons as propellants for dissolving material to be sprayed. In response to this first Patent Office action, the applicants amended their claims to require a stable lather and inserted limitations as to molar proportions of all propellants in all claims in which molar proportions were not already specified.

Applicants' attorneys called the examiner's attention to the range of proportions and the solubilities of the propellants of the invention, and noted that the claims recited a stable lather producing composition, combining an aqueous soap solution and a propellant taken from a defined class, which propellant should be relatively insoluble in water. They argued that Rotheim is not concerned with producing lather and that Rotheim nowhere teaches how to make any composition capable of producing a lather; that the liquid soaps referred to in Rotheim, which contain a substantial proportion of alcohol, may form satis-

6. Claim 12, which was typical, reads as follows: "A composition for use in producing lather comprising a liquid mixture of an aqueous soap solution and a volatile propellant in liquid phase, the composition being confined under the vapor pressure of the propellant, the proportion of propellant comprising from about .07 to about .025 moles per 100 grams of the composition, said propellant comprising at least one compound taken from the class comprising the saturated aliphatic hydrocarbons; the saturated aliphatic partially fluorine substituted hydrocarbons and the saturated aliphatic partially and wholly chlorine and fluorine substituted hydrocarbons, said propellant having a vapor pressure in the range from about 5 to about 300 pounds per square inch gauge at 70° F. and having a solubility in water not exceeding about 32 cc. of gas to 100 grams of water at atmospheric pressure and 25° C."

factory sprays, as contemplated by Rotheim; but that such soaps do not make compositions capable of producing stable lathers, because propellants useful in lather forming compositions dissolve in alcohol.

The examiner was not persuaded by these arguments. In a second Patent Office action, the examiner rejected all of the claims of the amended application on Rotheim, together with certain other references, including Getz U. S. Patent No. 2,435,682 and Boe U. S. Patent No. 2,524,590. A prior art article by Fulton listed Freons and hydrocarbons as propellants for soluble insecticide sprays. Getz listed nitrous oxide, dimethyl ether, Freon 12 and cyclopropane (a saturated aliphatic hydrocarbon) as soluble propellants to form whipped cream. Boe listed propane, isobutane and other saturated aliphatic hydrocarbons as well as Freon 12, Freon 114 and other Freons as propellants in various combinations to form sprays in the form of fine mist. None of these taught or suggested the combination of the Spitzer patent. However, the examiner stated that "the use of known propellant gases as propellants for aqueous soap solutions to form brushless shaving cream lacks invention over the art showing the use of these same propellants to expel liquid soaps, dry cleaning soap emulsions and a host of other materials". The examiner also stated: "Getz discloses Freon and hydrocarbon propellant condensible gases in combination with whipping cream under pressure. * * * Boe is cited to show possible combination of propellants, a list of which propellants is found in col. 3. The list includes the propellants employed in applicants' preferred combination."

In response to this action, the applicants cancelled the method claims included in the application as originally filed and made certain formal amendments to the product claims. The applicants made an extended argument on behalf of patentability, and submitted affidavits showing the commercial success of the product "Rise" and the unsuitability of products prepared with various propellants shown in the cited prior art patents. The patentees did not, however, submit any data with respect to the use of Rotheim's "isobutan [e] and other hydrocarbons" with liquid soap, other than a citation of solutions of soap in alcohol from Henley and an affidavit of applicant Reich on the effect of alcohol soaps on lather stability.

Applicants said: "Claims 1–17, inclusive, are believed to define a composition that is patentable over the disclosure of Rotheim in view of Getz and Boe. * * * The claims recite a composition for use in producing a stable lather comprising essentially a liquid mixture of an aqueous soap solution and a volatile propellant in liquid phase taken from a recited group, the propellant being present in a stated range of proportions and having a recited low water solubility. No citation discloses a composition in which the essential ingredients of the claims are combined. No citation discloses the range of proportions of ingredients recited in the claims. And no citation discloses any composition capable of producing a stable lather."

Up to this point the examiner had not mentioned Rotheim's isobutan [e] by name. He had, however, referred to the use of "these same propellants" (i. e., the same as applicants') to expel "liquid soaps". The only prior art patent cited up to this point which referred *eo nomine* to "liquid soaps" was Rotheim. Boe referred to a soap solution as an ingredient of his wax emulsion, and also referred to a dry cleaning soap emulsion which was to be sprayed with Freon 12. The only "same propellants" found in the Spitzer application and in Rotheim were "isobutan [e] and other hydrocarbons".

Claims 1, 2, 4, 5 and 12 of the Spitzer application were still drawn to combinations including propellants selected from the group consisting of (1) the saturated aliphatic hydrocarbons, (2) the partially fluorinated hydrocarbons, and (3) the chlorfluorinated hydrocarbons. All of

them then contained limitations as to molar proportions and vapor pressures.

After filing their second amendment, applicants' attorneys had an interview with the examiner and reached an understanding that a further amendment would be filed. This amendment, filed on January 9, 1952, entitled "Supplemental Amendment", deleted the phrase "the saturated aliphatic hydrocarbons" from all claims in which it occurred. There is nothing in the report of the conference between the attorneys and the examiner contained in the file wrapper to indicate why the deletion was made.

Reference to the interview was made in the attorneys' remarks accompanying the amendment, as follows: " * * * It was further pointed out at the interview that the claimed invention is not merely the use of a new or better propellant for a material previously propelled by some other propellant. Instead, the claimed invention is a new combination of a particular class of propellants in mixture with aqueous soap solution which produces an entirely new result, namely a composition capable of producing a stable lather. No citation discloses the claimed combination of an aqueous soap solution and a propellant of the class claimed, nor any combination of a soap solution and any propellant capable of producing a stable lather."

The effect of this amendment was that thereafter no claim of the patent application recited the saturated aliphatic hydrocarbons within its literal scope. At no time afterwards did the patent applicants attempt to insert language which would have recited the saturated aliphatic hydrocarbons or any particular saturated aliphatic hydrocarbon(s) within the literal scope of the claims.

Another effect of the amendment was that the claims of the application no longer covered any of the propellants disclosed in the Rotheim patent, which had been cited by the examiner as a reference in rejecting the claims of the patent as previously drafted. The applicants stated in the remarks accompanying the amendment that "no citation

discloses the claimed combination of an aqueous soap solution and a propellant of the class claimed." Since Boe disclosed not only the hydrocarbons but also the Freons and other compounds as propellants, the last quoted statement evidently used the word propellant in a different sense from the word compound, intending to include in the word propellant the molar proportions and other limitations which had been inserted in the claims. Those same limitations, of course, would have applied to the saturated aliphatic hydrocarbons if those compounds had not been eliminated from the claims. The examiner, therefore, must have felt that it was necessary to eliminate the saturated aliphatic hydrocarbons, even as so limited. I find, therefore, that the deletion of the "saturated aliphatic hydrocarbons" from the claims of the patent application was an important step in overcoming the examiner's rejection of the former claims upon the prior art.

Following this supplemental amendment applicants' attorneys had several additional conferences with the examiner. The examiner suggested that the propellant be confined to chlorinated and fluorinated methanes and ethanes. On July 3, 1952, a second Supplemental Amendment was filed in which all of the previously pending claims, 1 through 17 inclusive, were cancelled, thereby canceling the other two classes originally presented in claims 1, 2, 4 and 5, and 12, i. e. "the saturated aliphatic partially fluorine substituted hydrocarbons and the saturated aliphatic partially and wholly chlorine and fluorine substituted hydrocarbons." All of the claims which formerly referred to the propellants as halogenated hydrocarbons were amended to recite that the propellants were halogenated ethanes or methanes. The exact language suggested by the examiner was used. The attorneys wrote: "In accordance with the Examiner's suggestion, the definition of 'propellants' in such claims as do not recite specific propellant compositions has been changed to 'the saturated aliphatic partially and

wholly fluorine and chlorfluorine substituted ethanes and methanes'. This appears to be more a concise phrase of the same scope as that previously employed." In discussing the effect of the amendment the applicants stated that "the combination of ingredients essential to the production of a stable lather is now recited in all of the claims in a manner that clearly distinguishes the applicants' invention from the citations * * *."

In a third Patent Office action on July 10, 1952, all claims were again rejected "as unduly broad and indefinite", and some were rejected as "incomplete" with respect to the soaps and soap solutions. The applicants made a further amendment to meet this objection. Following still another interview with the examiner, an additional amendment was made to correct typographical errors and certain improper forms of expression, and notice of allowance issued on January 23, 1953.

On July 16, 1953, a post-allowance amendment under Patent Office Rule 312 was filed in accordance with an understanding reached at a further interview with the examiner. Apart from formal matters, the effect of that amendment was to recast the class designation of propellants and to add new claims. The claims added included claim 60 (present claim 16) and four dependent claims, claims 61 through 64 (present claims 17 through 20). With respect to claim 60 (present claim 16), the patentees stated: "Claim 60 is a combination claim similar in context to claim 1, but wherein each element of the composition is a preferred range or value, disclosed as such, instead of the broader ranges of the allowed claims." The patentees represented that the scope of the claims was not enlarged and that no new search as to patentability was required. They asserted: "The allowed claims have been amended to define the propellant more clearly in the form of a generic group rather than the Markush[7] group now employed." The examiner was assured that the amendment was not an attempt to recapture propellant coverage previously given up.

Claims 16 and 19 of the patent as issued are narrower than the cancelled claims. Claim 16 gives the preferred limitations for the combination of soap solution and propellant of the Spitzer invention.

Even if claim 16 is read to include combinations employing the propane, butane, isobutane and cyclobutane equivalents of the five Freons literally named therein, the scope of claim 16 is still less in scope than the scope of the cancelled claims. If claim 19 is read to include combinations employing the propane-isobutane propellant mixture in place of the Freon 12-Freon 114 propellant mixture literally named therein, the scope of claim 19 remains less in scope than the scope of the cancelled claims.

In summary, I find as a fact that the elimination of isobutane and the other saturated aliphatic hydrocarbons was a controlling factor in overcoming the examiner's rejection of the original claims and in procuring the issuance of the patent.

■ File wrapper estoppel bars recourse to the doctrine of equivalents in cases where the patentee attempts to secure through equivalents what has been rejected by the Patent Office. It prevents application of the doctrine of equivalents to recapture coverage which the patentee has surrendered by amendment whether or not the prior art required the amendment. In the leading case of Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 136–137, 62 S. Ct. 513, 518, 86 L.Ed. 736. Chief Justice Stone said: "Assuming that the patentee would have been entitled to equivalents embracing the accused devices had he originally claimed a 'conductor means embedded in the table', a very different issue is presented when the applicant,

7. Ex parte Markush, 1925 C.D. 126, 340 O.G. 839; Ex parte Dahlen, 1934 C.D. 9, 441 O.G. 510.

in order to meet objections in the Patent Office, based on references to the prior art, adopted the phrase as a substitute for the broader one 'carried by the table'. Had Claim 7 been allowed in its original form it would have read upon all the accused devices, since in all the conductor means complementary to the coil spring are 'carried by the table'. By striking that phrase from the claim and substituting for it 'embedded in the table' the applicant restricted his claim to those combinations in which the conductor means, though carried on the table, is also embedded in it. By the amendment he recognized and emphasized the difference between the two phrases and proclaimed his abandonment of all that is embraced in that difference. Hubbell v. United States, 179 U.S. 77, 83, 21 S. Ct. 24, 26, 45 L.Ed. 95; Weber Electric Co. v. E. H. Freeman Electric Co., 256 U.S. 668, 677–678, 41 S.Ct. 600, 603, 65 L.Ed. 1162; I. T. S. Rubber Co. v. Essex Rubber Co., 272 U.S. 429, 440, 444, 47 S.Ct. 136, 140, 141, 71 L.Ed. 335; Smith v. Magic City Kennel Club, 282 U.S. 784, 789, 51 S.Ct. 291, 293, 75 L.Ed. 707; Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 61 S.Ct. 235, 85 L.Ed. 132; cf. in case of disclaimer Altoona Public Theatres v. American Tri-Ergon Corp., 294 U.S. 477, 492, 493, 55 S.Ct. 455, 461, 462, 79 L.Ed. 1005. The difference which he thus disclaimed must be regarded as material, and since the amendment operates as a disclaimer of that difference it must be strictly construed against him. Smith v. Magic City Kennel Club, supra, 282 U.S. page 790, 51 S.Ct. page 293; Shepard v. Carrigan, 116 U.S. 593, 598, 6 S.Ct. 493, 495, 29 L.Ed. 723; Goodyear Dental Vulcanite Co. v. Davis, 102 U.S. 222, 228, 26 L.Ed. 149. As the question is one of construction of the claim it is immaterial whether the examiner was right or wrong in rejecting the claim as filed. Hubbell v. United States, supra, 179 U.S. page 83, 21 S.Ct. page 26; I. T. S. Rubber Co. v. Essex Rubber Co. supra, 272 U.S. page 443, 47 S.Ct. page 141. It follows that what the patentee, by a strict construction of the claim, has disclaimed—conductors which are carried by the table but not embedded in it—cannot now be regained by recourse to the doctrine of equivalents, which at most operates, by liberal construction, to secure to the inventor the full benefits, not disclaimed, of the claims allowed." Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 136–137, 62 S.Ct. 513, 86 L.Ed. 736.

Plaintiffs rely upon what they conceive to be a statement of a narrow rule of estoppel in Baker-Cammack Hosiery Mills v. Davis Co., 4 Cir., 181 F.2d 550, at page 563: "When claims are rejected and withdrawn while an invention is pending in the Patent Office the patentee is estopped to contend that the allowed claims should be given the same breadth and interpretation as the abandoned claims. Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 218, 61 S. Ct. 235, 85 L.Ed. 132; Exhibit Supply Co. v. Ace Corp., 315 U.S. 126, 136, 62 S.Ct. 513, 86 L.Ed. 736." Plaintiffs say that they are not asking for the same breadth and interpretation as the abandoned claims, but only for some of the compounds which are included in the class of saturated aliphatic hydrocarbons which was abandoned. The quoted sentence, however, must be read in the context of the whole paragraph and of the cases cited, both of which indicate clearly that the Fourth Circuit did not intend to narrow in any way the rule announced in the Schriber and the Exhibit Supply cases. When an amendment is made to meet an examiner's objection, the applicant proclaims his abandonment of *all* that is embraced in the difference between the original and the abandoned claim.

Plaintiffs cite cases applying the doctrine of equivalents to recover coverage to which the examiner had made no objection; but those cases are clearly distinguishable. In the case at bar, the deletion of the saturated aliphatic hydrocarbons directly met one of the examiner's objections.

Plaintiffs argue that file wrapper estoppel should not be applied in a situa-

520

tion where a patentee, having claimed his invention too broadly, either amends his broad claim or substitutes a narrower claim because he had mistakenly claimed more than his invention or inadequately claimed the same. While mistake may not ordinarily be relied on to relieve against the effect of cancellation, "a court of equity * * * should not extend the rule of estoppel beyond what is strictly required, where it is apparent that the claim cancelled is not identical with the one allowed and that to strike down the latter would be to deprive the patentee of the whole benefit of a meritorious invention." Florence-Mayo Nuway Co. v. Hardy, 4 Cir., 168 F.2d 778, 784. Undoubtedly there are cases where it would be inequitable to bar the patentees recourse to the doctrine of equivalents. But this is not such a case. I do not find as a fact that the patentees in our case mistakenly claimed more than their invention or inadequately claimed the same. They deliberately drafted their original claims to cover the saturated aliphatic hydrocarbons as well as the Freons. The amendment eliminating the hydrocarbons was made after the limitations with respect to molar proportions, etc. had been applied to them as well as to the Freons. To apply plaintiffs' argument in this case would be contrary to the teaching of Exhibit Supply Co. v. Ace Patents Corp., supra, and the cases cited therein.

In Aeration Processes, Inc., v. Lange, 196 F.2d 981, certiorari denied 344 U.S. 834, 73 S.Ct. 43, 97 L.Ed. 649, the Eighth Circuit had before it the Getz patent for pressurized edible cream, referred to above. A divided court sustained the validity of the patent, but refused to find infringement because of the history of the application in the Patent Office. The accused product contained 15% carbon dioxide, which, being acid-forming, took the mixture outside the claims of the patent, even though the remaining 85% of the propellant was nitrous oxide, and carbon dioxide had been mentioned in the specification as usable, with a caveat as to its tastes. In his first application Getz had claimed a mixture of nitrous oxide and carbon dioxide, but that claim was later abandoned. The court stated: "He identified the mixture of the gases as one that he knew of and had considered for his purpose, but he stood on his abandonment of it through all the years of Patent Office proceedings. He shows no right to any monopoly in respect to the mixture to which he unequivocally and knowingly abandoned all claim." 196 F.2d at page 985. So, in the case at bar, the patentees unequivocally and knowingly abandoned all claims which included the aliphatic hydrocarbons among the propellants. If patentees had intended to retain certain aliphatic hydrocarbons, such as propane and isobutane, limited to the specified molar proportions, they could have presented new or amended claims. They did not do so.

■ Plaintiffs next argue that file wrapper estoppel should not operate as a bar in this case unless it is shown that the prior art precludes the expansion of their claims. However, in applying the doctrine of file wrapper estoppel it is immaterial whether the examiner's rejection of the amended claim was right or wrong. Exhibit Supply Co. v. Ace Patents Corp., supra. The patentee is estopped not because of the prior art but because of his acquiescence in the examiner's position as to what the prior art permitted. "If dissatisfied with the rejection he should pursue his remedy by appeal; and where, in order to get his patent, he accepts one with a narrower claim, he is bound by it." I. T. S. Rubber Co. v. Essex Rubber Co., 272 U.S. 429, 443, 47 S.Ct. 136, 141, 71 L.Ed. 335.

■ In the instant case, therefore, the important question is not what the prior art in fact forbade, but the examiner's position as to what it forbade. In the first rejection it was stated that "Rotheim shows that combinations of liquid soaps and low pressure propellants to be old". In spite of applicants' argu-

ments that Rotheim was concerned with atomizing, and that "liquid soaps" did not include soap solutions, the examiner repeated the rejection. He asserted: "The use of known propellant gases as propellants for aqueous soap solutions to form brushless shaving cream lacks invention over the art showing the use of these same propellants to expel liquid soaps." The amendment of the Spitzer claims to remove the Rotheim propellants—"isobutan[e] and other hydrocarbons—" met this objection, and now bars plaintiffs from regaining those propellants regardless of whether the examiner was right or wrong in insisting on his position. Exhibit Supply Co. v. Ace Patents Corp., supra. Instead of appealing or presenting narrower claims listing only propane, butane, isobutane and cyclobutane, in the same molar proportions and with the other limitations which were already in all of the claims, applicants further narrowed the class of claimed propellants and stated to the examiner that "all of the claims which formerly referred to the propellants as hydrocarbons have been amended to recite that the propellants are ethanes or methanes." Such amendments, following the rejection of general claims, are conclusive, especially where their narrowing effect is emphasized by the applicants themselves. Union Carbide & Carbon Corp. v. Graver Tank & Mfg. Co., 7 Cir., 196 F.2d 103, 109.

Finally, plaintiffs argue that file wrapper estoppel does not apply where the claim asserted is narrower than the cancelled claims. They cite dicta by Judge Learned Hand: "While the rejection of a claim does of course forbid any interpretation of those secured which leaves them identical with that rejected, it does not necessarily prevent their being read as equivalent to any species of the rejected claim, which the doctrine of equivalents justifies. It only forbids the patentee from reducing his claim to the rejected claim, simpliciter." Deitel v. Unique Specialty Corp., 2 Cir., 54 F.2d 359, 360; and " * * * Of course, the fact that verbal-

ly the infringing process is not within the claim is no objection to the application of the doctrine of equivalents; indeed it creates the very occasion that should invoke it. * * * surrender [i. e. cancellation of a generic claim] does not of course result in a dedication of all species of the genus surrendered; but it does surrender any monopoly upon the genus as such: i. e. unless it be restricted to some species of that genus." Musher Foundation v. Alba Trading Corp., 2 Cir., 150 F.2d 885, 887–888, certiorari denied, 326 U.S. 770, 66 S.Ct. 175, 90 L.Ed. 465. Judge Hand's dicta are always persuasive, and these might be controlling in a proper case, although they are not supported by any Supreme Court authority and if applied to the facts of this case would be in conflict with I. T. S. Rubber Co. v. Essex Rubber Co., 272 U.S. 429, 443, 47 S.Ct. 136, 71 L.Ed. 335; Smith v. Magic City Kennel Club, Inc., 282 U.S. 784, 790, 51 S.Ct. 291, 75 L.Ed. 707; Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 220, 61 S.Ct. 235, 85 L.Ed. 132; 312 U.S. 654, 61 S.Ct. 235, 85 L.Ed. 132; Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 136, 62 S.Ct. 513, 86 L.Ed. 736, and Lewis v. Avco Mfg. Corp., 7 Cir., 228 F.2d 919, 923–928. The controlling point is that a patentee may not recover by invoking the doctrine of equivalents anything he has given up to meet an examiner's objection based upon the prior art. Exhibit Supply Co. v. Ace Patents Corp., supra; I. T. S. Rubber Co. v. Essex Rubber Co., supra; Union Carbide & Carbon Corp. v. Graver Tank & Mfg. Co., 7 Cir., 196 F.2d 103.

Judge Hand recognized this himself when he noted that the claims in the Musher Foundation case were not cancelled to escape rejection upon a reference from the prior art cited by the examiner; "they were 'voluntarily' withdrawn after they had been allowed along with the claims in suit." 150 F.2d at page 888.

In the instant case the claims were given up to escape rejection upon a

reference from the prior art. The saturated aliphatic hydrocarbons in the original claims were subject to the same limitations with respect to molar proportions, etc. as the Freons. The hydrocarbons were given up to escape rejection on Rotheim, which had specifically referred to isobutane. Plaintiffs cannot now recover isobutane and the other saturated aliphatic hydrocarbons which they gave up by amendment.

It is unimportant that several amendments were necessary to narrow the claims sufficiently to induce the examiner to allow them. The critical amendments eliminating the saturated aliphatic hydrocarbons removed one of the examiner's bases for objection. The fact that other amendments were necessary to satisfy other objections is immaterial, since there is no evidence that the examiner would have permitted the claims to issue with his first objection unsatisfied. The elimination of isobutane and the other saturated aliphatic hydrocarbons was a controlling factor in overcoming the examiner's rejection of the original claims and in procuring the issuance of the patent.

 Under the facts of this case I see no escape from the conclusion that plaintiffs are barred by file wrapper estoppel from invoking the doctrine of equivalents to sustain their charge that Colgate's altered product, using propane and isobutane as the propellant, infringes claim 16 and claim 19 of the Spitzer patent.

### II-A-2(b) Judicial Estoppel

At the trial before Judge Coleman plaintiff Reich, one of the inventors, testified that they had tried a large number of propellants and found most of them unsatisfactory, although some of the hydrocarbons (propane, butane, isobutane and cyclobutane) were unsatisfactory simply because they were inflammable. Plaintiffs offered in evidence a chart in the form of a tree with numerous branches, to show, as stated by their counsel, the particular group of propellants which Reich found useful, as contrasted with others which are mentioned in the patent but which he found not useful. Reich testified: "The materials within that little rectangle [Freon 12 and Freon 114] are the ones that we found would make good and satisfactory shaving cream lathers. The propellants shown on all the other branches and twigs and limbs are propellants which are suggested by the prior art, which are things that we had to consider but which are not suitable for making shaving lathers, even though they may be suitable for spraying insecticides or making ordinary aerosols." He added that Freon 113 was fairly good and probably should be included with the other two.

Plaintiffs' counsel argued that the combination of an aqueous soap solution mixed or emulsified in liquid phase with a Freon of low water solubility was new, and "gave rise to this invention"; that the invention "revolves about a small group of Freons having special properties"; that all of the claims of the patent are limited to essentially a non-smarting and stable lather from a Freon. In the Court of Appeals, after stating that "some of the simple hydrocarbons like propane and butane gave fairly good lathers but were not safe or permissible because of inflammability", plaintiffs' counsel argued: "Finally a special, highly selective small class or sub-group of Freon compounds was segregated as having all desirable characteristics"; that the discovery of this small handful of compounds out of hundreds of possibilities and the "gerrymandering" of them into a precise sub-group capable of chemical definition involved thousands of experiments and research ingenuity of the highest order. Plaintiffs' counsel stated that the hydrocarbon propellants were outside the literal scope or definition of the Spitzer patent, but they did not at any time make an unequivocal statement to either of the courts that the claims of the patent are so limited as to ex-

clude the hydrocarbons as equivalent propellant gases if used within the molar proportions and other limitations of the combination of the invention.

Judge Coleman said: "There was, of course, nothing novel in the use of soap to make lather, nor in the use of a can as a container, nor in the use of a gas liquefied by pressure and mixed with another liquid to spray the mixture from the can. What was novel was to get a mixture of the right gases, with the right soaps in the right proportions, confined in a container under the right pressure, so that a lather satisfactory for shaving purposes would be produced when the mixture was allowed to emerge." This passage was quoted, with approval, by the Fourth Circuit, 230 F.2d at page 858. But neither of the courts sustained the validity of the patent over the prior art on the ground that the claims were so limited as to exclude from their scope propane and isobutane as propellants in the invention combinations, or treated any differences between those hydrocarbons and the Freons specified in the claims as a material or controlling distinction in upholding the validity of the patented combination.

Colgate was not misled by reason of any statements made by plaintiffs or by plaintiffs' counsel. In its efforts to avoid the patent in suit, Colgate experimented with various propellant gases, including Freons outside the water solubility range of the Spitzer patent, before adopting propane and isobutane, which the patent itself teaches have the optimum qualities for the formation of a stable non-smarting shaving lather.

The controlling legal principles on the issue of judicial estoppel are set out in E-I-M-Co. v. Philadelphia Gear Works, 5 Cir., 223 F.2d 36, and Union Carbide & Carbon Corp. v. Graver Tank Mfg. Co., 7 Cir., 196 F.2d 103. I conclude that the testimony and arguments offered on behalf of plaintiffs at the prior trial in this court and on appeal would not of themselves be sufficient to bar plaintiffs' recourse to the doctrine of equivalents at this time.

## II-B. Trade Secrets Issue

Paragraph 12 of Judge Coleman's decree read as follows: "That the defendant Colgate-Palmolive Company has wrongfully and unlawfully misappropriated trade secrets of plaintiff by embodying them in pressurized lather shaving compositions as follows: * * * (c) By combining in a pressurized lather-generating composition a soap solution superfatted with petrolatum, carbowax and excess stearic acid, and embodying said secret combination in its products 'Rapid Shave No. 2' and 'Instant Barber Shave'."

Paragraph 13 directed that Colgate be enjoined "from making, or causing to be made, using, or causing to be used, or selling, or offering for sale a pressurized lather shave cream utilizing the trade secret specified in paragraph No. 12(c), above, except as such trade secret is disclosed in United States Letters Patent No. 2,655,480, in suit."

The injunction issued by this Court on November 19, 1956, enjoins Colgate from making, etc, a pressurized lather shave cream utilizing the trade secret specified in 12(c), above.

The adjudicated products contained triethanolamine stearate (TEA) soap solutions. The injunction, however, is not limited to combinations using TEA soap solutions and was not intended to be so limited. Colgate's altered product does not use a TEA soap but uses alkali metal soaps. To avoid sputtering, Colgate includes in the altered product 1% of lauric myristic diethanolamide, known as LMDEA. LMDEA is a non-ionic, foaming, wetting agent, but is not one of the wetting agents specifically named in the patent in suit. It causes a loss of body of the lather. To restore this loss of body, Colgate superfats the altered product with about 15 parts of excess stearic acid to 100 parts of soap. The excess stearic acid may also give the lather a mild emollient effect, although the evidence indicates that 20 parts of excess searic acid to 100 parts of soap are required before the emollient effect is apparent to the average user. The altered

product contains no petrolatum and no carbowax.

Plaintiffs originally contended that the use by Colgate of LMDEA was in contempt of that part of the injunction forbidding infringement of the patent. Plaintiffs dropped that contention shortly before the hearing on the pending motion. Plaintiffs still contend, however, that superfatting with excess stearic acid alone violates the injunction against superfatting with petrolatum, carbowax *and* excess stearic acid. Failing that contention, plaintiffs seek to have the injunction broadened to forbid superfatting with petrolatum *or* carbowax *or* excess stearic acid.

■ The language of the decree is clear; it is conjunctive and not disjunctive. Although the word "and" may sometimes be construed to mean "or", there is no reason for such construction in the instant case. "In contempt proceedings for its enforcement, a decree will not be expanded by implication or intendment beyond the meaning of its terms when read in the light of the issues and the purpose for which the suit was brought, and the facts found must constitute a plain violation of the decree so read." Terminal R.R. Ass'n of St. Louis v. United States, 266 U.S. 17, 29, 45 S.Ct. 5, 8, 69 L.Ed. 150. Courts do not make a "strained and extreme construction" to spell out contempt of court. National Labor Relations Board v. Standard Trouser Co., 4 Cir., 162 F.2d 1012, 1015.

■ The history of the development of paragraph 12 of the decree shows that plaintiffs' present construction was not contemplated at the time of the settlement of the decree. Superfatting with excess stearic acid alone is ancient in the soapmaking art. Plaintiffs' original proposal in this connection would have applied only to superfatting *a TEA soap solution* with an excess of stearic acid. Judge Coleman requested that the proposed language be redrawn to eliminate the necessity of additional findings. Accordingly, plaintiffs submitted as their second proposal language which would have accomplished the same result by defining the trade secret as the subject matter of one of the Fine patent applications. When Colgate objected to this definition the judge requested that it be made more specific. Accordingly, plaintiffs withdrew the suggestion and substituted substantially the language now appearing in the decree.

At no time during the negotiations leading up to the decree did plaintiffs take the position that the trade secret was as broad as they presently contend it to be. Properly construed, the injunction does not forbid superfatting with excess stearic acid alone.

Carbowax, petrolatum and stearic acid are customary agents for superfatting all kinds of soap solutions. Since the use of LMDEA, to which plaintiffs do not now object, requires the use of some superfatting agent, it would be inequitable to extend the language of the decree to prohibit the use of any one of them. Both Judge Coleman and the Court of Appeals reiterated a number of times that the invention in the instant case consisted of a particular combination of well-known elements. Similarly, the trade secret consisted of the use of a combination of three well-known superfatting agents.

The accused products do not violate plaintiffs' trade secret by combining in a pressurized lather-generating composition a soap solution superfatted with petrolatum, carbowax and excess stearic acid.

Plaintiffs have not shown that inadvertence, mistake or surprise caused them to claim less than they were entitled to claim.

The time for determining the scope of plaintiffs' trade secret rights was at the settlement of the decree. If at that time the plaintiffs felt that they were not accorded sufficiently liberal treatment their remedy was to make their objection known to the judge settling the decree, who could then have determined

the merits of their claim. If the decision had been adverse to their contentions they could have appealed.

Plaintiffs cannot, without showing most unusual circumstances, reopen the question at this late date. The Court of Appeals and this court have rejected efforts by Colgate to modify the mandate and the decree. 243 F.2d 163; 151 F. Supp. 427. Plaintiffs in their turn now seek such a modification in their favor. They have shown no sufficient ground therefor.

## III. Patent Misuse

■ The doctrine of unclean hands may be invoked where there has been misconduct on the part of the patentee while the patent application was being prosecuted in the Patent Office or where he has made improper use of the patent after it has been issued.

Patentees have been denied relief where they were guilty of fraud in a prior litigation, Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293, or where they were asserting their rights contrary to the policy of the antitrust laws or other public interest. Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363; B. B. Chemical Co. v. Ellis, 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367; Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376.

Colgate contends that plaintiffs should be denied relief because plaintiffs have indulged in an "oppressive licensing program". Colgate complains that plaintiffs issued licenses with respect to products other than pressurized shaving creams. However, in the instant case, plaintiffs had the right to do so.

Colgate then contends that plaintiffs made misleading statements in letters soliciting such licenses. I find that, viewed in proper perspective, any such misleading statements were venial and were entirely insufficient to prevent enforcement of whatever rights plaintiffs may have at this time under the decree in this case.

■ Colgate alleges that the licenses offered were designed to assure plaintiffs a monopoly considerably broader than their patent. This charge is predicated on the fact that the definition of "licensed product" appearing in some of the earlier offered licenses was ambiguous because it did not expressly refer to the claims of the patent. This ambiguity was called to plaintiffs' attention in early 1957, and plaintiffs promptly rectified the ambiguity by expressly incorporating reference to the claims. Plaintiffs never, at any time, insisted upon a construction of their early license agreement by which a broader monopoly would be acquired than that granted by the patent claims. Under these facts there was no misuse of the patent monopoly. North Drive-In Theater Corp. v. Park-In Theatres, 10 Cir., 248 F.2d 232.

■ Complaint is also made by Colgate that in the license agreements the licensee was required to acknowledge the validity of the patents and not to contest the same. This provision is unobjectionable. Baker-Cammack Hosiery Mills v. Davis Co., 4 Cir., 181 F.2d 550; Steiner Sales Co. v. Schwartz Sales Co., 10 Cir., 98 F.2d 999.

■ Colgate further complains that the licensee is required to pay royalties up to the expiration date of any improvement patent. The license agreements expressly provide for payment of royalties so long as the product is covered by the claims of the Spitzer patent, its reissue or any improvement patents. Since the agreement permits the use of such improvement, the provision to which Colgate objects merely puts into express language the implied obligation of the licensees.

■ Requiring the licensee to take a "package" license may be an unlawful use of a patent monopoly. American Security Co. v. Shatterproof Glass Corp., D.C.D.Del.1957, 154 F.Supp. 890. That case involved the violation of an antitrust decree which had been previously entered by a court of competent jurisdiction in which the patentee was a party defendant. In the case at bar, there is

no evidence that plaintiffs would issue a license under the basic Spitzer patent *only* on condition of an acceptance by the licensee of a provision including any other patent. In the absence of such evidence, an allegation of this type of misuse fails. Apex Electrical Mfg. Co. v. Altorfer Bros., 7 Cir., 238 F.2d 867, 871.

Colgate has failed to show any conduct which has soiled the hands of plaintiffs to the extent that they may not prosecute their pending motion before this court.

Counsel will prepare an order giving effect to the rulings in this opinion.